Argued March 21, affirmed April 21, reconsideration denied
May 28, petition for review denied June 18, 1975

## STATE OF OREGON (No. 14-678), *Respondent, v.* MARK ANDREW GARRISON, *Appellant.*

534 P2d 210

*J. Marvin Kuhn,* Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

*Timothy Wood,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and FOLEY and HOWELL, Judges.

FOLEY, J.

Defendant had been tried and convicted in 1973 for the murder of Daniel Burns Boles. He appealed and this court reversed because certain statements of the defendant should not have been introduced in defendant's trial since the statements were taken in violation of the rule of *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966). *State v. Garrison,* 16 Or App 588, 519 P2d 1295, Sup Ct *review denied* (1974). This court remanded the case for retrial and this appeal is from his conviction on the retrial.

Defendant's contention on this appeal is that the trial court should have suppressed the testimony of Daniel Deaver, the accomplice of defendant, and certain physical evidence because it was the "fruit" of defendant's statement which this court ordered suppressed on the first appeal.

The "fruit of the poisonous tree" doctrine is recognized as a rule that evidence which is located by the police as a result of information and leads obtained from illegally obtained evidence constitutes the fruit

of the poisonous tree and is inadmissible in a criminal prosecution. *See Nardone v. United States,* 308 US 338, 60 S Ct 266, 84 L Ed 307 (1939); Annotation, 43 ALR3d 385 (1972).

■ Among the recognized exceptions to the rule is the "inevitable discovery" limitation. Courts recognizing this exception hold that fruit of the unlawful evidence is not inadmissible under the "fruits" doctrine where it is shown that such evidence inevitably would have been gained from an independent source.[1] *See United States v. Nagelberg,* 434 F2d 585 (2d Cir 1970), *cert denied* 401 US 939 (1971). *See also,* Maguire, *How to Unpoison the Fruit—The Fourth Amendment and the Exclusionary Rule,* 55 J Crim LC & PS 307, 313-17 (1964). We join the courts which subscribe to the above limitation.[2]

■ The annotator in 43 ALR3d 385, 401 (1972), is careful to point out that resolution of the question of whether evidence should be barred under the "fruit

---

[1] ORS 133.683 codifies the "inevitable discovery rule" in search and seizure cases:

"If a search or seizure is carried out in such a manner that things seized in the course of the search would be subject to suppression, and if as a result of such search or seizure other evidence is discovered subsequently and offered against a defendant, such evidence shall be subject to a motion to suppress unless the prosecution establishes by a preponderance of the evidence that such evidence would have been discovered by law enforcement authorities irrespective of such search or seizure, and the court finds that exclusion of such evidence is not necessary to deter violations of ORS 133.525 to 133.703."

[2] The inevitable discovery limitation on the fruit of the poisonous tree doctrine has been approved as serving well the rationale of the exclusionary rule by denying to the government the use of evidence come at by the exploitation of illegality while at the same time minimizing the opportunity for the defendant to receive an undeserved and socially undesirable bonanza. Maguire, *How to Unpoison the Fruit—The Fourth Amendment and the Exclusionary Rule,* 55 J Crim LC & PS 307 (1964).

of the poisonous tree" doctrine depends upon the particular "facts and circumstances of the individual case." Here it seems clear from the testimony of Deaver that he was furnishing the evidence independently of that obtained from the defendant. Deaver pointed out that the fact that he had told four other persons about being involved in the crime would have permitted the police to trace down the facts. It thus appears that discovery of the challenged evidence was inevitable, in that it would have resulted in spite of the police having obtained the evidence improperly from the defendant.

Deaver testified at the hearing on the motion to suppress:

"Q   Now, you first denied to the police your or Mark's [defendant's] involvement; is that correct?

"A   Yes.

"Q   Later on you told them of your involvement and Mark's involvement; is that correct?

"A   Yes.

"Q   What made you change your mind in what you told the police at that time?

"A   Well, there was several reasons.   The night before I was arrested, I had called a police officer in Portland, because when I came back to the apartment I found out that they had been there twice, and at that time I just—I had wanted to inform them as to what happened, to try and get it straightened out to how it really happened. And then the next morning, two officers came and arrested me while I was sleeping on Scott Widden's couch, up above me.   And at that time, I denied it because I got scared.   And I went down —I denied it all the way down to headquarters. And headquarters informed me that Garrison was telling them that I had done it and done it on my

own will, and that he had had nothing to do with it. So, then, I went ahead and told them the true story.

"Q Assume that they had not so informed you, would you have maintained your first story?

"A No.

"Q Why do you say, 'No?'

"A Because if the officers hadn't come and arrested me in the manner in which they did, which was a normal manner of arrest, but I became scared at that time—I would have told them myself, by going down myself if they hadn't come.

"Q Would—or did the fact that you had told at least 4 other persons of some involvement, enter into your decision to tell the police officers the ultimate truth or your second statement?

"A Yes.

"Q Why was that?

"A Well, because eventually they could have traced it down to those people."

The trial court found that:

"* * * * *

"4. The police investigation which was underway at the time of the interrogation of the defendant by Hinman and Purcell had determined that Daniel Deaver was a suspect and would have led to the questioning of Daniel Deaver as a suspect independent of any statements by the defendant."

and

"5. Pursuant to police investigation, Daniel Deaver would have confessed his implication in the crime independent of any statements made by the Defendant.

"* * * * *"

There is evidence which supports the conclusions reached by the trial court.

The record is incomplete as to defendant's motion to suppress evidence discovered at the scene of the crime. The evidence proposed to be suppressed was not specified in the motion to suppress and the trial court denied the motion on that ground. The trial court proceeded, however, to make the following oral finding:

"I am satisfied in this case, based on Mr. Deaver's testimony that the State would have discovered Mr. Deaver and that Mr. Deaver would have in fact led the law enforcement authorities to the crime scene, regardless of Mr. Garrison's confession. For that reason, I am denying Mr. Lonergan's motion to suppress with regard to what has been term[ed] the fruits of the illegally obtained confession concerning only the crime scene."

There is evidence which supports the trial court's finding that the "inevitable discovery" of the physical evidence at the crime scene was likewise not rendered inadmissible under the "fruits" doctrine.

■ A review of the record can admit of no doubt of defendant's guilt of the crime charged. We conclude from our review thereof that defendant received a fair trial.

Affirmed.